# United States Court of Appeals
## For the First Circuit

---

No. 00-1078

CHESTER F. SIDELL AND FAYE L. SIDELL,

Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

---

APPEAL FROM THE UNITED STATES TAX COURT

[Hon. Julian I. Jacobs, <u>Judge</u>]

---

Before

Torruella, <u>Chief Judge</u>,

Selya, <u>Circuit Judge</u>,

and Casellas,* <u>District Judge</u>.

---

<u>David R. Andelman</u>, with whom <u>Juliette Galicia Pico</u> and <u>Lourie & Cutler, P.C.</u> were on brief, for appellants.
<u>Ellen Page Delsole</u>, Attorney, Tax Division, U.S. Dep't of Justice, with whom <u>Paula M. Junghans</u>, Acting Assistant Attorney General, and <u>Kenneth L. Green</u>, Attorney, Tax Division, were on brief, for appellee.

---

September 22, 2000

---

**SELYA, Circuit Judge.** The Commissioner of the Internal Revenue Service (IRS) issued a deficiency notice to Mr. and Mrs. Chester F. Sidell (the taxpayers) for taxes, interest, and penalties allegedly due in respect to the years 1993 and 1994. The Commissioner premised this deficiency determination on an assertion that the taxpayers had misclassified certain rental income as passive rather than nonpassive. Unhappy with this turn of events, the taxpayers sought a judicial anodyne. The Tax Court sided with the Commissioner. See Sidell v. Commissioner, T.C. Memo. 1999-301, 78 T.C.M. (CCH) 423 (1999). The taxpayers appeal, averring that the Tax Court erred in accepting the Commissioner's recharacterization of their rental income, and that in all events they should be permitted to use credits for rehabilitation of historic property to offset their income in the years in question. Discerning no error in the Tax Court's resolution of this dispute, we affirm.

## I. BACKGROUND

The relevant facts are straightforward. At the pertinent times, Chester F. Sidell owned all the stock of KGR Industries, a Massachusetts corporation. KGR operated as a regular business corporation — a so-called C corporation — and itself paid taxes. See 26 U.S.C. §§ 301-385 (subtit. A, ch. 1, subch. C). C corporations are different in kind from entities

-3-

that are not themselves taxpayers but which function as conduits for attributing gains and losses to their owners (e.g., partnerships, see 26 U.S.C. §§ 701-771 (subtit. A, ch. 1, subch. K), and S corporations, see id. §§ 1361-1379 (subtit. A, ch. 1, subch. S)).

In 1985, increased demand for KGR's private-label clothing generated a need for expanded production facilities. Sidell met this need by purchasing the Everett Mill, an historic property that he refurbished and leased to KGR.[1]  He was able to benefit personally from this effort by claiming rehabilitation tax credits under 26 U.S.C. § 46(b)(4)(A) (the precursor to 26 U.S.C. § 47).  Those credits are not at issue in this appeal.

When KGR continued to experience growing pains, Sidell endeavored to replicate this serendipitous scenario.  In 1992, he purchased the Kunhardt Mill, an historic property located across the street from the Everett Mill.  He structured this transaction in nearly identical fashion, beginning a qualified rehabilitation immediately after acquisition, see Secretary of

_____

[1]Sidell's acquisition of the Everett Mill and his subsequent acquisition of the Kunhardt Mill, discussed infra, were both accomplished through nominee trusts of which he was the sole beneficiary.  Because no one asserts that the trusts have independent significance for tax purposes, we treat the properties as owned outright by Sidell.

-4-

the Interior, Standards for Rehabilitation, 36 C.F.R. § 67, and completing it in approximately one year's time.

The taxpayers claimed rehabilitation tax credits in connection with the Kunhardt Mill restoration. They used those credits (totaling $85,361 in 1993 and $24,284 in 1994) to offset rental income paid by KGR. But the story did not have quite so happy an ending the second time around. In the Commissioner's view, the rehabilitation tax credits could only be used to offset passive income; and under the law applicable to the years in question (1993 and 1994), the rental income received from KGR was nonpassive. Because the taxpayers had no other passive income for those years, the Commissioner disallowed the claimed offsets and asserted deficiencies amounting to $103,728 for 1993 and $41,621 for 1994.

Dismayed by the Commissioner's stance, the taxpayers brought suit. See 26 U.S.C. §§ 6213(a), 6214(a), 7442. The Tax Court sustained the Commissioner's determination of the existence and extent of the deficiencies. See Sidell, T.C. Memo. 1999-301. This appeal followed.

## II. ANALYSIS

In this court, as below, the taxpayers advance three principal lines of argument. First, they maintain that the regulations, namely, Treas. Reg. § 1.469-2(f)(6) (1992) and

-5-

Treas. Reg. § 1.469-4(a) (1994), are invalid insofar as they purpose to recharacterize income received from closely-held C corporations as nonpassive. Second, they note that they had completed the Kunhardt Mill rehabilitation before October 4, 1994 (the effective date of the attribution rule, Treas. Reg. § 1.469-4(a)), and they claim that certain transition rules apply (under which, in their view, the rent received from KGR should be treated as passive income). Finally, the taxpayers contend that depriving them of the benefit of the rehabilitation tax credits for the years in which the work was performed not only would flout the language of 26 U.S.C. § 47, but also would undermine the legislative policy behind it. We deal with each of these asseverations in turn. As the case was submitted on a stipulated record and the taxpayers train their fire on the Tax Court's legal determinations, our review is plenary. See Strickland v. Commissioner, Me. Dep't of Human Servs., 48 F.3d 12, 16 (1st Cir. 1995).

### A. Validity of the Final Regulations.

The regulations at issue — Treas. Reg. § 1.469-2(f)(6) and Treas. Reg. § 1.469-4(a) — were issued by the Secretary of the Treasury under a specific grant of authority from Congress. See 26 U.S.C. § 469(l). We afford such legislative regulations a high degree of respect: an inquiring court must give

-6-

legislative regulations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984). The upshot is that a court should enforce such regulations as long as they have a rational basis and are reasonably related to the purposes of the enabling legislation. See P. Gioioso & Sons, Inc. v. OSHRC, 115 F.3d 100, 107 (1st Cir. 1997). Against this backdrop, the taxpayers' claim of invalidity gains little traction.

The starting point for a reasoned appraisal of that claim is 26 U.S.C. § 469(l), which empowers the Secretary, in relevant part, to

> prescribe such regulations as may be necessary or appropriate to carry out provisions of [Sec. 469], including regulations — . . . (3) requiring net income or gain from a limited partnership or other passive activity to be treated as not from a passive activity . . . .

The taxpayers suggest that Congress, through this language, only intended the Secretary to promulgate regulations that required net passive income derived from certain pass-through entities, such as partnerships or S corporations, to be treated as nonpassive. The Secretary, however, went further; after considerable backing and filling, discussed infra, he released the final regulations here at issue.

The first of these regulations — embodying what is sometimes called the "self-rental rule" — instructs taxpayers on how rental income is to be characterized for tax purposes. It states:

> An amount of the taxpayer's gross rental activity income for the taxable year from an item of property equal to the net rental activity income for the year from that item of property is treated as not from a passive activity if the property —
>
> (i) Is rented for use in a trade or business activity (within the meaning of paragraph (e)(2) of this section) in which the taxpayer materially participates (within the meaning of § 1.469-5T) for the taxable year; and (ii) Is not described in § 1.469-2T(f)(5).

Treas. Reg. § 1.469-2(f)(6) (1992).

The second regulation — which embodies what is sometimes called the "attribution rule" — reads:

> A taxpayer's activities include those conducted through C corporations that are subject to section 469, S corporations, and partnerships.

Treas. Reg. § 1.469-4(a) (1994). This regulation hardly could be clearer: it makes the self-rental rule applicable to transactions between closely-held C corporations and their owners.

The taxpayers' argument on this point prescinds from the uncontroversial premise that, apart from persons whose

primary trade or business is real estate, a taxpayer's receipt of rent typically comprises passive income.  The Secretary's newly-devised regulatory regime alters this treatment in a certain class of cases, and the taxpayers argue that Congress intended to limit the Secretary's power to effect such alterations to activities conducted by pass-through entities (like partnerships or S corporations).  The ultimate question, then, is whether the Secretary had the authority under section 469(l) to stretch the bounds of coverage to include income or gain received from entities which, like C corporations, are not pass-through entities.  We conclude that the Secretary acted appropriately in setting the parameters of the regulatory scheme.

The authority given to the Secretary, as illustrated by the statutory text, is quite broad.  The statute empowers him to promulgate any regulations that he deems "necessary or appropriate" to further the goals of section 469.  Importantly, this includes the explicit power to treat what normally would be passive income as nonpassive if he believes that such a shift is warranted.  Although the statute mentions limited partnerships as one possible subject of regulation, the category is open-ended, not closed, as witness Congress's use of the inclusive phrase "or other."  <u>Accord</u> <u>Fransen</u> v. <u>United States</u>, 191 F.3d

599, 600-01 (5th Cir. 1999).   Given the apparent breadth of authority ceded to the Secretary, and the congruence between the final regulations and the statute's evident goal (eliminating tax shelters), it is exceedingly difficult to imagine how the application of the self-rental rule to shareholders of closely-held C corporations (which the Tax Court accurately called the "epitome" of self-renting transactions, see Sidell, T.C. Memo. 1999-301, at 20) can be considered arbitrary, capricious, or contrary to Congress's will.

The legislative history points unerringly in the same direction.  The House Conference Report affords valuable insight into the purposes behind the broad delegation of authority:

> The conferees intend that this authority be exercised to protect the underlying purpose of the passive loss provision, i.e., preventing the sheltering of positive income sources through the use of tax losses derived from passive business activities . . . .  Examples of where the exercise of such authority may . . . be appropriate include the following . . . (2) related property leases or sub-leases, with respect to property used in a business activity, that have the effect of reducing active business income and creating passive income . . . .

H. Conf. Rept. 99-841, at 147, reprinted in 1986 U.S.C.C.A.N. 4075, 4235.  This clear statement of congressional intent fits hand and glove with the expansive language of the statute itself.   One may question the wisdom of the policy choice

-10-

embodied in the regulatory scheme, but one hardly can question the Secretary's authority to choose that policy.

To be sure, the tax structure of a C corporation differs from that of a pass-through entity. Despite this difference, however, embracing the taxpayers' rationale would run a grave risk of contradicting congressional intent. If the recharacterization rules were invalidated, individuals in the Sidells' position would be able to avoid application of the self-rental rule by the simple expedient of structuring businesses that they controlled as C corporations and siphoning off the profits as rent (and, therefore, as passive income). Insofar as the possibility of converting earned income into rental payments is concerned, the dangers of manipulation are essentially the same as those that attend pass-through entities. We think it reasonable to assume that Congress wanted to enable the Secretary to restrict the opportunity for such manipulative behavior across the board.

Our conclusion comports with that of other courts. The Fifth Circuit has determined that the attribution rule, as framed, is a valid outgrowth of the Secretary's power under section 469. See Fransen, 191 F.3d at 601. So too the Tax Court. See Krukowski v. Commissioner, 114 T.C. No. 25 (2000) (en banc) [2000 U.S. Tax Ct. LEXIS 31, at *19-*23]; Schwalbach

-11-

v. <u>Commissioner</u>, 111 T.C. 215, 220 (1998). These decisions reinforce our conclusion that the treasury regulations here at issue reflect a proper exercise of the Secretary's duly delegated authority. Hence, we reject the taxpayers' challenge to their legitimacy.

## B. <u>Applicability of the Attribution Rule</u>.

The taxpayers assert that even if the final regulations are valid as applied to the activities of closely-held C corporations, this case avoids their grasp. Since this claim depends on timing, we limn the chronology of relevant events.

In the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2087 (codified, as amended, in scattered sections of 26 U.S.C.), Congress sought to eliminate a host of tax shelters that savvy taxpayers had concocted over time. As part of this bill, Congress carefully distinguished between passive and nonpassive activities, and provided that "any activity — (A) which involves the conduct of any trade or business, and (B) in which the taxpayer does not materially participate" would be regarded as a passive activity. 26 U.S.C. § 469(c)(1). As previously noted, Congress authorized the Secretary of the Treasury to promulgate regulations "which specify what constitutes . . . material participation, or active participation" for this purpose. 26 U.S.C. § 469(l)(1). Acting

pursuant to this authority, the Secretary released a series of regulations designed to describe when a taxpayer was materially participating in a venture, such that the rental income from that venture would be treated as nonpassive income.

The Secretary's pronouncements initially took the form of temporary regulations. The first set of temporary regulations provided that shareholders in non-pass-through entities, such as C corporations, were not to be regarded as materially participating in the entity's activities. See Temp. Treas. Reg. § 1.469-5T(f)(1) (1988). The next year, the Secretary supplanted these regulations with another set of temporary regulations containing the same safe harbor for C corporation shareholders. See Temp. Treas. Reg. § 1.469-4T(b)(2)(ii)(B) (1989). The 1989 temporary regulations expired in 1992, and the Secretary replaced them with a set of proposed regulations. See 57 Fed. Reg. 20,802 (1992).

These new regulations worked a sea change. They eliminated most of the specific benchmarks that had characterized the temporary regulations and substituted a broad "totality of the circumstances" approach for the earlier, essentially mechanical approach used to determine whether an owner participated materially in an owned entity's activities. While the Commissioner simultaneously vouchsafed that the self-

-13-

rental rule was still velivolant, see Treas. Reg. § 1.469-2(f)(6) (1992), 57 Fed. Reg. 20,747, he omitted any further reference to taxpayers involved in non-pass-through entities. He was similarly silent as to whether owners of such entities would be regarded as material participants for purposes of the self-rental rule.

The attribution rule, contained in the final regulations issued by the Secretary in 1994, closed the circle. As noted above, see supra Part II(A), those regulations explicitly stated that the self-rental rule would be applied to shareholders of closely-held C corporations, and that such shareholders would be deemed to be material participants in the owned entity's activities. See Treas. Reg. § 1.469-4(a) (1994). The Secretary made the final regulations retroactive to taxable years ending after May 10, 1992. See id. § 1.469-11(a)(1). Apparently mindful, however, that he had erected something of a moving target, he gave taxpayers the option of relying on either the proposed regulations or the final regulations in figuring their taxes for tax years that both ended after May 10, 1992, and began before October 4, 1994. See id. § 1.469-11(b)(1).

Seizing on this option, the taxpayers claim that they are entitled to the largesse of the proposed regulations, and that under those regulations they may treat the rental income

-14-

paid by KGR as passive. The Commissioner acknowledges that, under the transition rules, the taxpayers are entitled to the benefit of the proposed regulations, but he asserts that those regulations treat rental income from closely-held C corporations exactly the same as do the final regulations (i.e., as nonpassive). Like the Seventh Circuit, see Connor v. Commissioner, 218 F.3d 733, 739 (7th Cir. 2000), we think that the Commissioner has the better of the argument.

As a general rule, an agency's interpretation of its own regulations is entitled to great deference. See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945); Johnson v. Watts Regulator Co., 63 F.3d 1129, 1134-35 (1st Cir. 1995). A court must uphold such an interpretation unless it is obviously erroneous or inconsistent with the language of the regulation. See Stinson v. United States, 508 U.S. 36, 45 (1993); Visiting Nurse Ass'n v. Bullen, 93 F.3d 997, 1002, 1008 (1st Cir. 1996). We descry no such error or inconsistency here.

It is true, as the taxpayers emphasize, that the proposed regulations contained no specific mention of C corporations or their shareholders. But context is critically important in the interpretive process, and the absence of such a reference, when coupled with the conspicuous disappearance of the safe harbor that had been a hallmark of the temporary

-15-

regulations, left the way open for the agency to lump closely-held C corporations with pass-through entities. The agency followed this course — and its determination does not constitute a plainly erroneous reading of the proposed regulations. When a regulation reasonably can be interpreted in different ways, courts ordinarily should honor the agency's choice among those iterations. See Johnson, 63 F.3d at 1134-35; Strickland, 48 F.3d at 17-18. So it is here.

We add, moreover, that such a reading would be preferred even if the agency itself had not made an independent interpretation of the proposed regulations. A close comparison of the sequential sets of regulations indicates that the Secretary allowed many of the specific provisions contained in the temporary regulations to expire and chose not to revivify them when crafting the proposed regulations. In our view, this chain of events is analogous to a legislative body's failure to reenact an expiring statute. In that situation, courts "generally refuse to construe a failure to re-enact a portion of a statute as indicative of a desire to retain the rule set forth in that portion." Connor, 218 F. 3d at 738 (citing Keppel v. Tiffin Savings Bank, 197 U.S. 356, 373 (1905)); see also 1A Norman J. Singer, Sutherland Statutory Construction § 23.28, at 413 (5th ed. 1993) (explaining that under traditional rules of

-16-

statutory construction, a failure to reenact a provision repeals the provision by implication). As the Tax Court perspicaciously stated when considering the precise question that confronts us: "The fact that the Secretary did not represcribe that exception [for C corporation shareholders] as part of the 1992 proposed regulations is persuasive evidence that he revoked the exception at that time." Krukowski, 2000 U.S. Tax Ct. LEXIS 31, at *19.

Ably represented, the taxpayers labor valiantly to forestall the conclusion that we reach. Some of their arguments are covered by what we already have said. Others are adequately treated in the Tax Court's opinion or are obviously incorrect. Only two points merit further discussion.

The taxpayers rely heavily on the dissenting opinion in Krukowski, a 9-to-7 en banc decision of the Tax Court. But that opinion is not persuasive. The dissenting judges hitched their wagon to a stated belief that "taxpayers could not have inferred from [the absence of an express reference in the proposed regulations] that the Commissioner had changed the prior rules to provide that shareholders participate in the activities of their C corporations . . . ." Id. at *68. (Beghe, J., dissenting). This misconstrues the facts.

The proposed regulations put all concerned parties on clear notice that change was in the wind. As noted by the

-17-

Seventh Circuit, the shift in analytical models from the mechanistic format favored in the temporary regulations to the more impressionistic format advocated in the proposed regulations "implies a repeal of all mechanical tests [not specifically reenacted] previously used to compute whether a taxpayer participated materially." Connor, 218 F.3d at 739. It follows inexorably that

> the natural interpretation of the failure to renew expressly this regulation is that taxpayers should be placed on notice that the Secretary expanded the existing standard for material participation . . . [and] the Secretary repealed by implication any per se exclusion of shareholders in non-passthrough entities . . . .

Id. The Tax Court reached a functionally identical conclusion. See Schwalbach, 111 T.C. at 228 ("[W]e read nothing in [these] regulations that would lead us to believe that the Commissioner was proposing to retain the [exclusion for C corporation shareholders]."). So do we: from the taxpayers' perspective, the deletion of the specific safe harbor for C corporation shareholders should have set off warning bells and constituted an early signal that a reversal of position had occurred.

The taxpayers also rely on a number of internal IRS memoranda purporting to show that when the proposed regulations were promulgated, IRS staff had not yet decided to apply the self-rental rule to the activities of closely-held C

corporations.  The taxpayers maintain that this decision did not come about until at least one year thereafter and they try to use this asserted fact in two related ways.  First, they contend that this paper trail verifies that the proposed regulations were not meant to take away the protection previously enjoyed by C corporation shareholders.  Second, they contend that the memoranda debunk the IRS's interpretation of the proposed regulations because they show that the IRS had not even considered this implication when the regulations were announced.[2]

We reject both aspects of this argument.  The tax code is an intricate web and demands clear rules so that it may be administered with as little uncertainty as possible.  To achieve this goal, the IRS must speak with a single voice, that is, through formal statements of policy such as regulations or revenue rulings.  See Connecticut Gen. Life Ins. Co. v. Commissioner, 177 F.3d 136, 145 (3d Cir. 1999).  Accordingly, statements by individual IRS employees cannot bind the Secretary.  See Armco, Inc. v. Commissioner, 87 T.C. 865, 867 (1986); see generally Irving v. United States, 162 F.3d 154, 166

---

[2]For his part, the Commissioner deems the internal IRS memoranda consistent with the agency's interpretation of the proposed regulations and, in all events, conceptualizes them as forming part of the agency's deliberative process.  Because the documents are irrelevant, see text infra, we need not evaluate the bona fides of these assertions.

(1st Cir. 1998) (en banc) ("[C]ourts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions.").  Because these internal memoranda represent the personal views of the authors, not the official position of the agency, they do not figure in our decisional calculus.  See Honeywell Inc. v. United States, 661 F.2d 182, 185-86 (Ct. Cl. 1981).

### C.  **The Rehabilitation Tax Credits**.

Last — but not least — the taxpayers claim that they were entitled to use their rehabilitation tax credits on their 1993 and 1994 returns regardless of the reclassification of their rental income.  In order to address this claim, we first supply some background.

At the pertinent time, the law provided for tax credits as an incentive for undertaking a qualified rehabilitation of an historic structure.  See 26 U.S.C. §§ 38(b), 46 (1), 47.  To qualify for such credits, a taxpayer had to meet certain standards propounded by the Secretary of the Interior.  See 36 C.F.R. § 67.  Congress placed the rehabilitation tax credit provision in subpart D of part IV of subchapter A of chapter 1 of subtitle A of the Internal Revenue Code.[3]  As such, the

---

[3]The need for this descriptive detail adequately evinces why, in the view of many Americans, the Internal Revenue Code is thought to have become an impenetrable maze.

-20-

provision comes within the purview of the statute restricting the use of "passive activity" credits in any tax year to

> the amount (if any) by which — (A) the sum of the credits from all passive activities allowable for the taxable year under — (i) subpart D of part IV of subchapter A . . . exceeds (B) the regular tax liability of the taxpayer for the taxable year allocable to all passive activities.

26 U.S.C. § 469(d)(2).

With this background in mind, we return to the case at bar. Here, the taxpayers earned rehabilitation tax credits while refurbishing the Kunhardt Mill. Nevertheless, the Commissioner scotched the use of these credits for the tax years in question. The Tax Court upheld this determination. See Sidell, 78 T.C. Memo. 1999-301, at 28. The taxpayers brand this disallowance as contrary to both the plain language of the enabling statute and the tenor of the congressional policy underlying it. We disagree.

To be sure, the applicable statute, as the taxpayers suggest, imposes only two pertinent preconditions to the use of rehabilitation tax credits. The first is that the credits arise out of the qualified rehabilitation of a certified historic structure (and, thus, be allowable under subpart D of part IV of subchapter A). See 26 U.S.C. § 469(d)(2)(A)(i). The taxpayers plainly satisfy this requirement.

-21-

The battleground here is the second condition — a condition which requires that the tax liability that the credit-holder seeks to offset be "allocable to [his] passive activities." Id. § 469(2)(B). The taxpayers posit that since only the income from a property is classified as nonpassive under the self-rental rule, their rental activities remain passive and, therefore, the tax liability incurred anent those activities is eligible to be offset by rehabilitation tax credits. See, e.g., Appellant's Reply Brief at 30 (maintaining that although the rental income received from KGR has been "recharacterized as nonpassive under the self-rental rule, the rental income will generate a tax liability, and therefore, the taxpayers will have a tax liability allocable to their passive activities").

This argument is no more than a clever exercise in semantics — and one that reads the rehabilitation tax credit provision with much too sanguine an outlook. In the Tax Reform Act of 1986, Congress aspired to close precisely the kind of tax loophole that the taxpayers here seek to exploit. See, e.g., House Conf. Rep. 99-841, at 147, reprinted in 1986 U.S.C.C.A.N. 4075, 4235 (explaining that "the underlying purpose of the passive loss provision [is to prevent] the sheltering of positive income sources through the use of tax losses derived

-22-

from passive business activities"). When Congress refined the rehabilitation tax credit four years latter, it aspired to grant a carefully circumscribed incentive for the restoration of historic structures — but there are no signs that it meant to blunt the thrust of its earlier handiwork. If allowed to prevail, the taxpayers' reading of the rehabilitation tax credit provision would undermine the overarching intent of Congress.

To be specific, the Secretary's regulations classify rent paid by closely-held C corporations to their proprietors as nonpassive income for a reason: so that the latter cannot manipulate the corporation's revenues to take advantage of the benefits that attach to the classification of income as passive. Free use of rehabilitation tax credits comprises one of those benefits. Thus, as more fully explained by the Tax Court, the Sidells' credits were not available for use in 1993 and 1994 because they exceeded their passive tax liability for those years. See Sidell, 78 T.C. Memo. 1999-301, at 27-28.

The sockdolager rests in the regulations. While both the 1988 and 1989 temporary regulations contained sunset provisions, the Secretary went out of his way to preserve Temp. Treas. Reg. § 1.469-3T in T.D. 8417, Limitation on Passive Activity Losses and Credits — Technical Amendments to Regulations, 57 Fed. Reg. 20,747 (May 15, 1992). That preserved

regulation, which comprises a part of the transition rules, makes it very clear that a taxpayer who earns rehabilitation tax credits must have net passive income in order to employ those credits in a given year.  See Temp. Treas. Reg. § 1.469-3T(g) (Examples (3) and (4)).  Since the taxpayers in this case do not have any net passive income for the years in question — what they had reported as passive income has now been reclassified by the Commissioner, see supra — they are not eligible to use their rehabilitation tax credits for those years.

Contrary to the taxpayers' importunings, this result does not defeat the purpose of the rehabilitation tax credit law.  The law still provides a meaningful incentive.  Indeed, the taxpayers, notwithstanding the reclassification of the Kunhardt Mill rental income, have at least three remaining avenues for taking advantage of the credits in later tax years.  First, they may carry over any unused credits indefinitely until such time as they have passive income to offset against these credits.  See 26 U.S.C. § 469(b); see also St. Charles Inv. Co. v. Commissioner, 110 T.C. 46, 56 (1998).  Second, upon sale or disposition of the rehabilitated property, the taxpayers can use any suspended credits against passive income from the same activity, then against net passive income from other activities, and finally, as a nonpassive loss.  See 26 U.S.C. § 469(g); St.

<u>Charles</u>, 110 T.C. at 49.  Third, the taxpayers at the time of disposition might be able to employ unused credits to adjust their basis in the property.  <u>See</u> 26 U.S.C. § 469(j)(9).  Viewed from this perspective, the Commissioner's disallowance of the rehabilitation tax credits for 1993 and 1994 does not contravene Congress's discernible intent.

**III.  CONCLUSION**

We need go no further.  The Commissioner's determination of the tax due and owing rests on a sturdy factual and legal foundation.  Accordingly, we sustain the decision of the Tax Court.

**<u>Affirmed</u>.**