FRANCIS J. DIRICO AND JENNIFER DIRICO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16202–09.        Filed November 13, 2012.

P–H leased land and telecommunication towers to S, his wholly owned S corporation, in exchange for a percentage of S's revenues from its leases of tower access to third parties. P–H also leased three parcels of land to S that were without towers. S also sold and serviced radios and provided specialized mobile radio (SMR) services to customers for a monthly subscriber fee. Four of the towers leased to S housed antennas in free (unused) space for the rent-free use of S's SMR customers. P–H reported the net income from his leases to S as passive activity rental income pursuant to I.R.C. sec. 469(c)(2). R alleges that (1) P–H's rental income from his tower and land rentals to S constituted income from property used in a trade or business in which P–H materially participated and, therefore, constituted non-passive-activity income pursuant to sec. 1.469–2(f)(6), Income Tax Regs., (2) that regulation applies only to P–H's profitable tower and land leases to S so that P–H's losses from unprofitable tower and land leases to S remain passive activity losses, and (3) P–H's income from the three land-only leases to S constituted non-passive-activity income pursuant to sec. 1.469–2T(f)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5721 (Feb. 25, 1988), because less than 30% of the leased property's unadjusted basis was subject to depreciation.

1. *Held*: S used the towers and associated land leased from P–H in a rental (not a trade or business) activity with the result that P–H's income from those leases constituted passive activity income (or loss) pursuant to I.R.C. sec. 469(c)(2), regardless of P–H's material participation in that activity. *See* I.R.C. sec. 469(c)(4).

2. *Held*, *further*, the prior holding renders moot Ps' objection to treating P–H's losses from unprofitable tower and land leases to S as passive activity losses.

3. *Held*, *further*, because the land included in the land-only leases was not "provided in connection with" any of the towers P–H leased to S, those leases may not be grouped with P–H's tower and land leases to S, *see* sec. 1.469–4(d)(2), Income Tax Regs., and, therefore, because less than 30% of the property

396

covered by those leases was depreciable, P–H's income therefrom constituted non-passive-activity income pursuant to sec. 1.469–2T(f)(3), Temporary Income Tax Regs., *supra*.

*Donald-Bruce Abrams*, *Daniel A. Nelson*, and *Lawrence I. Silverstein*, for petitioners.
*Nina P. Ching*, for respondent.

HALPERN, *Judge*: By notice of deficiency respondent determined deficiencies in petitioners' Federal income tax liabilities of $69,910 and $216,845 for their 2004 and 2005 taxable, calendar, years (years in issue), respectively.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All dollar amounts have been rounded to the nearest dollar.

The issues for decision are (1) whether rental income paid to Francis J. Dirico (petitioner), or to one of his wholly owned grantor or nominee trusts, by his wholly owned subchapter S corporation for the use of telecommunication towers and land constituted income from a passive activity (passive activity income) pursuant to section 469(c)(2) or income from a nonpassive activity (non-passive-activity income) pursuant to section 1.469–2(f)(6), Income Tax Regs., (2) whether the rental income involved in deciding the first issue is the net income derived from all of the property leased to petitioner's wholly owned subchapter S corporation or that derived from the profitable rentals only, (3) whether, in deciding the first issue, we should exclude from consideration petitioner's income from rentals of land without a tower and treat that income as non-passive-activity income pursuant to section 1.469–2T(f)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5721 (Feb. 25, 1988). [1]

---

[1] The notice of deficiency also reflects reductions in petitioners' itemized deductions for the years in issue, which derive from the principal adjustment and are not directly disputed by petitioners. Additionally, in their petition, petitioners argue that they are entitled to treat the portion of petitioner's income from his wholly owned subchapter S corporation that was attributable to that corporation's tower rental income as passive activity income even though the corporation reported his entire 100% distributive share of its income for the years in issue as "ordinary business income", a characterization that carried over to petitioners' individual joint returns for those years. On brief, however, petitioners abandon that argument, apparently because the record does not include a breakdown between the corporation's tower rental and other income for the years in issue. Therefore, we do not address that issue.

FINDINGS OF FACT

*Residence*

At the time the petition was filed, petitioners resided in Key Largo, Florida.

*Background*

Petitioner attended high school, college, and graduate school in Massachusetts. He earned an undergraduate degree in public health and epidemiology and did graduate-level courses in various technical areas. After completing his schooling, he worked in Boston as a staff engineer in his father's manufacturing business.

In the early 1970s, he formed what became Industrial Communications & Electronics, Inc. (ICE). ICE's business, which petitioner initially conducted out of his home in Pembroke, Massachusetts, was electrical contracting, servicing two-way radios, and, later, performing specialized services for cellular carriers. ICE moved, first to Kingston and then to Marshfield, Massachusetts, where, at the time of the trial, its corporate headquarters had been for the preceding 10 years. ICE also maintains small offices in Miami and Naples, Florida.

Before and during the years in issue, ICE was engaged in a variety of radio-related activities, including construction of and leasing access to telecommunications towers (towers), sales and servicing of Motorola radios, and providing specialized mobile radio services (SMR) for a monthly subscriber fee. It constructed towers both for unrelated parties and for its own use, the latter for rental to customers, including Verizon, T-Mobile, AT&T, paging companies, and government entities.

SMR was a pre-cellular-telephone-technology, push-to-talk radio system with some telephone capabilities. Before the cellular telephone industry matured, SMR was an attractive technology, offering party-line or intercom-like services to such users as security companies, plumbers, electricians, construction companies, and tow-truck and rubbish companies.

By 1997 or 1998, ICE and Nextel each owned half of the SMR frequencies in Boston. ICE used its frequencies in its SMR business, but, by then, Nextel's use of digital technology on

its frequencies resulted in interference that caused ICE's customers to have difficulty in using their SMR radios. The frequencies involved in the SMR business were both 800 and 900 megacycles (megs), and it was Nextel's use of the former that hurt ICE's customers and led to ICE's loss of some 90% of those customers. As a result, in 1997 or 1998 ICE disposed to Nextel all of its 800 megs frequencies in exchange for cash and Nextel's 900 megs frequencies. Thereafter, ICE rebuilt its SMR business as a 900 megs business, which continued during the years in issue. ICE mounted the SMR antennas on a small number (perhaps four) of the towers that it leased from petitioner during the years in issue. ICE placed the SMR antennas on what was otherwise free space, i.e., space not already used by lessee antennas.

During the years in issue, ICE was an S corporation (within the meaning of section 1361(a)(1)), and petitioner owned 100% (in 2004, indirectly, through another wholly owned S corporation, and, in 2005, directly) of its stock.

*Petitioner's Ownership and Leasing of Telecommunications Towers and Land to ICE*

During the years in issue, either individually or through grantor or nominee trusts, petitioner owned towers and land that he leased to ICE. In all, petitioner leased to ICE 19 properties in 2004 (10 consisting of both a tower and land owned by a nominee trust, 6 consisting of land owned by a nominee trust on which was situated a tower owned by ICE, and 3 consisting of land owned by petitioner with no tower) and 21 properties in 2005 (1 consisting of both a tower and land owned by petitioner, 10 consisting of both a tower and land owned by a nominee trust, 7 consisting of land owned by a nominee trust on which was situated a tower owned by ICE, and 3 consisting of land owned by petitioner with no tower). Those properties were in Massachusetts, Rhode Island, New Hampshire, and Florida. During both years, petitioner incurred net losses with respect to four of the properties leased to ICE, each consisting of tower and land.

Under the typical lease from either petitioner or one of the nominee trusts to ICE, the lessor leased the land, towers, and other property at a specified address to ICE for a five-year initial term with provision for indefinite five-year renewals in

consideration of "base rent of 25% of the gross tower rent revenue." ICE was responsible for payment of utilities and for maintenance of the leased property.

With respect to both the towers it leased from petitioner or a nominee trust and the towers it owned (on land it leased from a nominee trust), ICE leased tower access to unrelated third parties, including mobile telecommunication service providers such as Verizon and Nextel. ICE leased tower access to 3 to 20 tenants per tower, and each of those tenants would install up to 30 antennas on a tower. Under the typical tower access lease (entitled "License Agreement for Antenna Site"), the "licensee" is allowed to "install, operate, and maintain" at its "sole expense and risk" specified items of equipment (typically, antennas and transmission lines) in consideration of a "monthly license fee." The "licensor" is liable for repairs except those "required because of the fault or negligence of * * * [the licensee] or its designated maintenance company", in which event the "licensee" becomes responsible for the repairs. ICE, as lessor or "licensor", generally maintained each tower, made sure that it was painted and that the lights were working, picked up papers and other debris, plowed snow, etc.

*Petitioner's Involvement With ICE*

Petitioner was immersed in ICE's business operations, working long hours 5½ to 6 days every week, at least until the sale of the 800 megs SMR frequencies to Nextel in 1997 or 1998. Shortly after that sale, he and his family moved from Massachusetts to Key Largo, Florida. Thereafter, petitioner's involvement with the day-to-day activities of ICE lessened.[2]

---

[2] The trial testimony, certain of the exhibits, and the parties' briefs address the extent of petitioner's involvement with ICE during the years in issue. Assuming ICE used the towers and land leased from petitioner or a nominee trust in a "trade or business activity" as defined in sec. 1.469–4(b)(1), Income Tax Regs., the question is whether petitioner's involvement in that activity rose to the level of material participation therein, as defined in sec. 1.469–5T, Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), thereby triggering the application of sec. 1.469–2(f)(6), Income Tax Regs., to convert petitioner's tower and land rental income from passive activity to non-passive-activity income. For the reasons discussed below, we find that ICE did not use the towers and land leased from petitioner or a nominee trust in a trade or business activity, which renders moot the issue of whether petitioner materially participated in ICE's tower access leasing activity during the years in issue. Therefore, we do not address or attempt to resolve the conflicting evidence in the record regarding petitioner's involvement in the day-to-day operations of ICE during those two years.

*Petitioners' and ICE's Tax Returns*

Petitioners' returns for the years in issue reported the income and loss from the leasing of towers and land to ICE as passive activity income and loss for purposes of section 469. Those returns listed each of the individual land and tower rentals as a separate activity.

ICE's returns for the years in issue did not separately report the income or loss from its various activities. Rather, ICE reported its total net income as "ordinary business income". Moreover, on the Form 1120S Schedule K–1, Shareholder's Share of Income, Deductions, Credits, etc., it issued to petitioner for each of the years in issue, ICE included petitioner's entire 100% distributive share of its income for the year in Box 1, "Ordinary business income (loss)". Consistent with those Schedules K–1, petitioner reported his distributive share of ICE's income for the years in issue as ordinary, non-passive-activity income on Schedule E, Supplemental Income and Loss.

*Respondent's Adjustments at Issue*

For each of the years in issue, respondent recharacterized petitioner's income from profitable rentals of towers and/or land from passive activity income to non-passive-activity income for purposes of section 469. He did not, however, so recharacterize petitioner's losses from unprofitable tower and land rentals. On that basis, respondent recharacterized $428,128 and $590,054 for 2004 and 2005, respectively, from passive activity income to non-passive-activity income, attributable to profitable rental properties, but he did not so recharacterize $143,829 and $157,824 for 2004 and 2005, respectively, of losses attributable to unprofitable rental properties.

As noted *supra* note 1, for each of the years in issue, respondent also made correlative adjustments that are not in dispute.

OPINION

I. *Burden of Proof*

Each party argues that the other should bear the burden of proof. We have found many facts without the need to

determine who bears the burden of proof. With respect to one possible material fact, i.e., whether petitioner materially participated in ICE's tower access leasing activity, the parties propose conflicting findings. Because our disposition of the case makes it unnecessary to find whether petitioner materially so participated, *see supra* note 2, there are no facts left to be found, only issues of law as applied to undisputed facts. Therefore, it is unnecessary to assign burden of proof.

## II. *Applicable Law*

### A. *General Principles*

Section 469(a) disallows the passive activity loss of an individual taxpayer. The term "passive activity loss" means the amount, if any, by which the aggregate losses from all passive activities for the taxable year exceed the aggregate income from all passive activities for such year. Sec. 469(d)(1). A "passive activity" is any activity involving the conduct of a trade or business in which the taxpayer does not materially participate.[3] Sec. 469(c)(1). In addition, with an exception that is inapplicable herein, *see* sec. 469(c)(7), the term "passive activity" includes any rental activity (defined in section 469(j)(8) as "any activity where payments are principally for the use of tangible property"), regardless of the taxpayer's material participation therein, sec. 469(c)(2), (4); *see Carlos v. Commissioner*, 123 T.C. 275, 278 (2004). A taxpayer's "activities" include those conducted through an S corporation. Sec. 1.469–4(a), Income Tax Regs.

Section 1.469–1T(e)(3)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), states that an activity is a "rental activity" for the taxable year if "(A) [d]uring such * * * year, tangible property held in connection with the activity is used * * * or held for use by customers" and

(B) The gross income attributable to the conduct of the activity during such taxable year represents (or, in the case of an activity in which property is held for use by customers, the expected gross income from the conduct of the activity will represent) amounts paid or to be paid principally for the use of such tangible property (without regard to whether the use of the property by customers is pursuant to a lease or pursuant to a service contract or other arrangement that is not denominated a lease).

---

[3] See sec. 469(h) for the definition of "material participation".

Section 1.469–1T(e)(3)(ii)(A)–(F), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988), lists six exceptions or instances in which an activity involving the use of tangible property is not a "rental activity" for the taxable year, none of which is alleged by respondent to be applicable herein.

B. *Recharacterization of Passive Activity Rental Income*

Section 469(l), in relevant part, directs the Secretary to issue "such regulations as may be necessary or appropriate to carry out provisions of * * * [section 469] including regulations * * * (3) requiring net income or gain from a * * * passive activity to be treated as not from a passive activity". [4] Pursuant to that legislative directive, the Commissioner promulgated section 1.469–2T(f), Temporary Income Tax Regs., *supra*, which incorporates by reference section 1.469–2(f)(5) and (6), Income Tax Regs., and is entitled "Recharacterization of passive income in certain situations." Only section 1.469–2T(f)(3), Temporary Income Tax Regs., *supra*, and section 1.469–2(f)(6), Income Tax Regs., are alleged by respondent to be applicable herein; both apply to rental activities. The former provides, in relevant part, that, if less than 30% of the unadjusted basis of rental property is subject to the allowance for depreciation under section 167, the taxpayer's net passive activity income from the property shall be treated as non-passive-activity income (sometimes, the 30% test). The latter provides, in relevant part, as follows:

(6) Property rented to a nonpassive activity.—An amount of the taxpayer's gross rental activity income for the taxable year from an item of property equal to the net rental activity income for the year from that item of property is treated as not from a passive activity if the property—

  (i) Is rented for use in a trade or business activity * * * in which the taxpayer materially participates (within the meaning of sec.1.469–5T) for the taxable year * * *

In general, "trade or business activities" constitute "activities, other than rental activities". Sec. 1.469–4(b)(1), Income Tax Regs.

_____

[4] The conference report accompanying the enactment of sec. 469 cites, as an example of passive activity income to be converted into non-passive-activity income, income from "related party leases or sub-leases, with respect to property used in a business activity, that have the effect of reducing active business income and creating passive income". H.R. Conf. Rept. No. 99–841 (Vol. II), at II–147 (1986), 1986–3 C.B. (Vol. 4) 1, 147.

Thus, application of section 1.469–2(f)(6), Income Tax Regs. (sometimes, the self-rental rule), requires the satisfaction of two conditions: (1) property must be rented for use in a trade or business and (2) the lessor-taxpayer must materially participate in the trade or business. [5]

The fact that section 1.469–2(f)(6), Income Tax Regs., recharacterizes the net rental activity income from "an item of property" rather than the net income from the taxpayer's entire rental activity means that the passive losses generated by unprofitable rental properties remain passive activity losses. Therefore, those losses do not offset the recharacterized (from passive activity to non-passive-activity) income from the taxpayer's profitable rental properties. *Veriha v. Commissioner*, 139 T.C. 45, 49 (2012); *Carlos v. Commissioner*, 123 T.C. at 280–282.

C. *Rules for Grouping Activities*

Section 1.469–4(c), Income Tax Regs., entitled "General rules for grouping activities", provides: "(1) Appropriate economic unit. One or more trade or business activities or rental activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469." Section 1.469–4(c)(2), Income Tax Regs., applies a facts and circumstances test for determining whether activities constitute "an appropriate economic unit".

Section 1.469–4(d), Income Tax Regs., provides limitations on the grouping of activities. In that regard, section 1.469–4(d)(1)(i), Income Tax Regs., provides that "[a] rental activity may not be grouped with a trade or business activity unless the activities * * * constitute an appropriate economic unit" and

(A) The rental activity is insubstantial in relation to the trade or business activity;

(B) The trade or business activity is insubstantial in relation to the rental activity; or

(C) Each owner of the trade or business activity has the same proportionate ownership interest in the rental activity, in which case the portion

---

[5] Although sec. 1.469–2(f)(6), Income Tax Regs., has been challenged as invalid, its validity has been upheld repeatedly. *See, e.g.*, *Krukowski v. Commissioner*, 279 F.3d 547, 552 (7th Cir. 2002), *aff'g* 114 T.C. 366 (2000); *Sidell v. Commissioner*, 225 F.3d 103, 107–108 (1st Cir. 2000), *aff'g* T.C. Memo. 1999–301; *Fransen v. United States*, 191 F.3d 599, 601 (5th Cir. 1999); *Shaw v. Commissioner*, T.C. Memo. 2002–35.

of the rental activity that involves the rental of items of property for use in the trade or business activity may be grouped with the trade or business activity.

Pursuant to section 1.469–4(d)(2), Income Tax Regs., real and personal property rental activities (other than where one type of property is provided in connection with the other) may not be grouped and treated as a single activity.

A shareholder in a section 469 entity such as an S corporation "may not treat activities grouped together by * * * [the S corporation] as separate activities." Sec. 1.469–4(d)(5)(i), Income Tax Regs. (last sentence).

Pursuant to section 1.469–4(e)(1), Income Tax Regs., "once a taxpayer has grouped activities * * *, the taxpayer may not regroup those activities in subsequent taxable years." However: "If it is determined that a taxpayer's original grouping was clearly inappropriate * * *, the taxpayer must regroup the activities". Sec. 1.469–4(e)(2), Income Tax Regs.

## III. *Summary of the Parties' Arguments*

### A. *Respondent's Arguments*

Respondent argues that, during the years in issue, petitioner (either individually or through a nominee trust) rented to ICE for use in its trade or business activities (1) telecommunications towers and land and (2) land on which ICE-owned towers were situated (together, tower and land rentals). Respondent further argues that, within the meaning of section 1.469–5T, Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), petitioner materially participated in those ICE activities. Therefore, respondent concludes, petitioner's income from those rentals must be recharacterized from passive activity income to non-passive-activity income pursuant to the self-rental rule of section 1.469–2(f)(6), Income Tax Regs. [6]

[6] The parties appear to agree that petitioner's tower and land rentals to ICE constituted a single activity. Presumably, both parties accept (and we agree) that those rentals represent the rental of personal property "provided in connection with" real property, or vice versa. Therefore, they come within the exception to the general prohibition against grouping real and personal property rentals. *See* sec. 1.469–4(d)(2), Income Tax Regs. Moreover, because petitioner's activities include those he conducted through ICE, *see* sec. 1.469–4(a), Income Tax Regs., his rentals of land with ICE-owned towers situated thereon are properly includable within that grouping as rentals of real property "provided in connection with" personal property indirectly provided by petitioner through ICE.

Respondent's argument that ICE's leasing of tower access to unrelated third parties constituted a trade or business is based, in part, on his view that (1) "ICE was in the trade or business of leasing and managing tower access to unrelated parties" and (2) that "business" and ICE's other business activities complemented one another with the overall result that they should be considered a single trade or business. Respondent also refers to ICE's maintenance of the towers, its payment of the electrical bills, and its providing of technical specifications to the lessees regarding how they should install their antennas. Respondent's argument that ICE's tower access rental activity must be considered a part of and included within its overall trade or business activity is based principally on the fact that ICE, on its returns and on the Schedules K–1 issued to petitioner for the years in issue, grouped all of its activities and reported the income there-from as "ordinary business income". Respondent argues that, pursuant to section 1.469–4(d)(5)(i) (last sentence) and (e)(1), Income Tax Regs., petitioners are bound by ICE's grouping of its activities and may not treat any of them as separate activities. Respondent further argues that ICE's grouping was correct on the ground that its activities constituted "an appropriate economic unit" and petitioner had the same proportionate interest (100%) in both his rental activity and ICE's trade or business activities. *See* sec. 1.469–4(d)(1)(C), Income Tax Regs.

Respondent also argues that, pursuant to section 1.469–2(f)(6), Income Tax Regs., he properly recharacterized, from passive activity income to non-passive-activity income, only petitioner's income from profitable tower and land rentals. In support of that argument, respondent cites *Carlos v. Commissioner*, 123 T.C. 275, and, in particular, our observation in *Carlos* that section 1.469–2(f)(6), Income Tax Regs., "explicitly recharacterizes net rental activity income from an 'item of property' rather than net income from the entire rental 'activity'". *Id.* at 280–281.

Lastly, respondent argues that petitioner's rental income for the years in issue from the three parcels of land without a tower that he leased to ICE (land-only rentals) must be re-characterized as non-passive-activity income pursuant to the 30% test of section 1.469–2T(f)(3), Temporary Income Tax Regs., *supra*, which requires such recharacterization with

respect to income from rental property less than 30% of the unadjusted basis of which is subject to the allowance for depreciation under section 167.

B. *Petitioners' Arguments*

Petitioners argue that, because ICE's leasing of tower access to third parties was a rental activity under section 469(j)(8), which, by definition, cannot be a trade or business activity, *see* sec. 1.469–4(b)(1), Income Tax Regs., petitioner (either individually or through a nominee trust) did not lease any properties to ICE for use in a trade or business. Therefore, the self-rental rule of section 1.469–2(f)(6), Income Tax Regs., does not apply to petitioners' rental income from those leases, which remains passive activity income, regardless of whether petitioner materially participated in the rental (or other) activities of ICE.

Petitioner argues alternatively that, even if ICE's leasing of tower access were treated as a trade or business (i.e., non-passive) activity, petitioners' rental income would still be passive activity income because petitioner did not, within the meaning of the regulations, materially participate in the activity.

Petitioner also objects to respondent's failure to net his profitable and unprofitable property rentals to ICE in determining the amount of income subject to recharacterization as non-passive-activity income under section 1.469–2(f)(6), Income Tax Regs. Petitioners argue that both the profitable and unprofitable rentals arose out of the same rental activity so that if the profits are to be treated as nonpassive so must the losses. Thus, petitioners reject as "excessive" respondent's treatment of the profits from profitable rentals as non-passive while allowing the losses from nonprofitable rentals to remain passive and, therefore, unavailable to offset the non-passive-activity rental income.

Petitioners make a similar argument in opposition to respondent's citation of section 1.469–2T(f)(3), Temporary Income Tax Regs., *supra*, as grounds for recharacterizing, from passive activity income to non-passive-activity income, his income from land-only rentals. Petitioners argue that, in determining whether less than 30% of the unadjusted basis of petitioners' property leased to ICE was depreciable, respondent should have included in the computation all of

the property leased to ICE, not just the real property included in the land-only rentals. Petitioner also argues that respondent's position with respect to the land-only rentals was first raised on brief and, for that reason, should be rejected as untimely.

IV. *Analysis and Conclusions*

A. *Application of the Self-Rental Rule: Section 1.469–2(f)(6), Income Tax Regs.*

1. *Introduction*

Application of section 1.469–2(f)(6), Income Tax Regs., to petitioner's tower and land rentals to ICE during the years in issue depends upon our finding that two conditions existed with respect to those rentals: (1) ICE used those properties in a trade or business activity (which, for purposes of section 469, is an activity other than a rental activity, *see* sec. 1.469–4(b)(1), Income Tax Regs.), and (2) petitioner materially participated in that trade or business activity. Because, for the reasons set forth below, we find that ICE did not use those properties in a trade or business activity, we do not address the issue of whether petitioner materially participated in ICE's tower access rental activities, and we hold that section 1.469–2(f)(6), Income Tax Regs., is inapplicable to petitioner's income from tower and land rentals to ICE.

2. *Analysis*

The fact that the typical tower lease between ICE and its tower access customers was denominated a "License Agreement for Antenna Site" is of no consequence. If the customer is paying for the use of tangible property, the activity is a rental activity "without regard to whether the use of the property * * * is pursuant to a lease * * * a service contract or other arrangement that is not denominated a lease." Sec. 1.469–1T(e)(3)(i)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988).

Also, the fact that ICE's various activities may have complemented one another does not alter the fundamental fact that ICE's leasing of towers and land to unrelated third parties was a rental activity within the meaning of section 469(j)(8) and section 1.469–1T(e)(3)(i), Temporary Income

Tax Regs., *supra*.[7] The few services that ICE provided in connection with its rentals (e.g., painting the towers, making sure the lights worked, plowing the snow around the towers) were equivalent to the services routinely provided by any lessor or landlord in order to make premises habitable by a lessee. They were no more than supportive of ICE's rental activities and did not turn those activities into trade or business activities as defined in section 1.469–4(b)(1), Income Tax Regs. More importantly, ICE's performance of those services did not bring its tower leasing activities within any of the exceptions to the definition of a rental activity that are described in section 1.469–1T(e)(3)(ii)(A)–(F), Temporary Income Tax Regs., *supra*. Those exceptions, none of which is alleged by respondent to be applicable herein, describe circumstances under which "an activity involving the use of tangible property" will not be considered a rental activity for the taxable year. They include rentals of "seven days or less" (subdivision (A)); rentals of 30 days or less accompanied by "significant" lessor-provided services (subdivision (B) and sec. 1.469–1T(e)(3)(iv), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988)); rentals accompanied by "extraordinary personal services" (i.e., the use of the property is "incidental" to the receipt of the services) (subdivision (C) and sec. 1.469–1T(e)(3)(v), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988)); rentals "incidental to a nonrental activity of the taxpayer" (subdivision (D) and sec. 1.469–1T(e)(3)(vi), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988)); rentals where the property is made available "during defined business hours for nonexclusive use by various customers" (subdivision (E)); rentals to a passthrough entity (e.g., an S corporation) where the taxpayer has made property available to the entity "in the taxpayer's capacity as an owner of an interest in" the entity (e.g., by way of capital contribution) for use in a nonrental activity (subdivision (F) and sec. 1.469–1T(e)(3)(vii), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988)). Four of those exceptions (section 1.469–1T(e)(3)(ii)(A), (B),

---

[7] That ICE's activities may have complemented one another is an indication that those activities may have constituted an "appropriate economic unit" within the meaning of sec. 1.469–4(c)(1), Income Tax Regs. But, as discussed *infra*, that fact alone, even if proven, would not justify the grouping of ICE's rental and nonrental activities. *See* sec. 1.469–4(d)(1), Income Tax Regs.

(E), and (F), Temporary Income Tax Regs., *supra*), are inapplicable by their terms, and respondent does not seek to apply the other two exceptions (section 1.469–1T(e)(3)(ii)(C) and (D), Temporary Income Tax Regs., *supra*), presumably because the facts herein overwhelmingly demonstrate their inapplicability, i.e., there is no basis for concluding that ICE's peripheral services afforded to tower lessees were "extraordinary personal services" as defined in section 1.469–1T(e)(3)(v), Temporary Income Tax Regs., *supra*, or that ICE's rental activity was "incidental" to its nonrental activities within the meaning of section 1.469–1T(e)(3)(vi), Temporary Income Tax Regs., *supra*. [8]

Respondent relies heavily on the fact that, for the years in issue, ICE reported (both on its own returns and on the Schedules K–1 issued to petitioner) all of its income as a single, undifferentiated amount denominated as "ordinary business income". He further notes: "There is no evidence in the records [sic] showing what income and expenses are attributable to each of ICE's business operations." Respondent argues that ICE's grouping of its activities as a single activity producing "ordinary business income" was proper under section 1.469–4(c) and (d), Income Tax Regs., and that, (1) under section 1.469–4(e)(1), Income Tax Regs., ICE may not "regroup" those activities and (2) under section 1.469–4(d)(5)(i), Income Tax Regs. (last sentence), petitioner may not treat those activities as separate activities for the years in issue.

Petitioners respond that, even if ICE's tower rental activity was to be combined with its other activities as part of "an appropriate economic unit" within the meaning of section 1.469–4(c)(1), Income Tax Regs., the actual disconnect between that activity and ICE's other activities, save for "the limited and rent-free use in the SMR business of antennas mounted in 'free space' * * * [atop] some of the towers", mandates its treatment as a passive activity thereby ren-

---

[8] ICE's only trade or business activity to which its tower rentals conceivably could have been considered "incidental" was its SMR business for which it provided "free space" for SMR antennas atop no more than four of those towers. The record indicates that ICE received no rent for providing that space. Under those circumstances, it is beyond dispute that the towers in question were not "predominantly used in * * * [the SMR business] during the taxable year or during at least two of the five taxable years * * * [immediately preceding] the taxable year" as required by sec. 1.469–1T(e)(3)(vi)(C)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5703 (Feb. 25, 1988).

dering the self-rental rule of section 1.469–2(f)(6), Income Tax Regs., inapplicable to petitioner's tower and land rentals to ICE during the years in issue. We agree with petitioner.

ICE's grouping of its activities and its reporting of those activities on its returns for the years in issue and on the Schedules K–1 issued to petitioner as a single business activity generating "ordinary business income" was improper. Section 1.469–4(d)(1), Income Tax Regs., prohibits the grouping of a rental activity and a trade or business activity unless those activities constitute an "appropriate economic unit" (as defined in paragraph (c) of the regulation) *and* one of three additional conditions is satisfied. Respondent does not argue that either ICE's tower rental activity or its non-rental activities is "insubstantial" in relation to the other, i.e., he agrees that neither of the first two conditions applies herein. *See* sec. 1.469–4(d)(1)(i)(A) and (B), Income Tax Regs. Respondent does argue, however, that the third condition, set forth in section 1.469–4(d)(1)(i)(C), Income Tax Regs., applies because "petitioner had the same proportionate ownership interest in each of ICE's activities (including the rental activity)" and that, therefore, "the grouping of ICE's non-rental and rental activities was proper."

Section 1.469–4(d)(1)(i)(C), Income Tax Regs., permits the grouping of a taxpayer's rental and trade or business activities, which form an "appropriate economic unit", and "[e]ach owner of the trade or business activity has the same proportionate ownership interest in the rental activity, *in which case the portion of the rental activity that involves the rental of items of property for use in the trade or business activity may be grouped with the trade or business activity*." (Emphasis added.)

As petitioner points out, respondent's argument does not take into account the emphasized language. Pursuant to that language, only the portion of ICE's tower rental activity that involves the rental of petitioner's towers for use in an ICE trade or business activity may be grouped with that trade or business activity. ICE's only use of petitioner's towers in a trade or business activity was its use of perhaps four of petitioner's towers to house antennas used in ICE's SMR business. But the SMR customers' use of those towers was on a rent-free basis, and that use was de minimis as compared to the use of the towers by ICE's tower rental customers. Thus, no

portion of the income from ICE's rental activity involved "the rental of" petitioner-owned towers for use in ICE's SMR business. [9] Therefore, we conclude that section 1.469–4(d)(1)(i)(C), Income Tax Regs., does not support respondent's application of the self-rental rule to recharacterize, from passive activity to non-passive-activity income, any portion of petitioner's income from his tower and land rentals to ICE.

The question, then, is whether ICE's erroneous grouping of its rental and other activities and its treatment of those activities as a single "ordinary business" activity is, by virtue of the last sentence of section 1.469–4(d)(5)(i), Income Tax Regs., and section 1.469–4(e)(1), Income Tax Regs., binding on petitioner with respect to his tower and land rentals to ICE with the result that the self-rental rule of section 1.469–2(f)(6), Income Tax Regs., is applicable to his income therefrom (assuming that petitioner materially participated in that "ordinary business" activity).

Pursuant to the last sentence of section 1.469–4(d)(5)(i), Income Tax Regs., petitioner, in his capacity as ICE's sole shareholder, may not treat any of ICE's activities as separate activities ("A shareholder * * * may not treat activities grouped together by a section 469 entity as separate activities."). [10] That provision might serve as the basis for denying to petitioner the right to treat his 100% distributive share of the income from ICE's tower rentals to third parties as income from a separate activity generating passive activity income, even if he were able to determine the amount of that income. [11] It is not, however, authority for the application of the self-rental rule to petitioner's income from his tower and land rentals to ICE. Petitioner derived that income as a *lessor* of property to ICE, *not* as a *shareholder*. Because petitioner wore his lessor hat (and not his shareholder hat), the last

<hr />

[9] Respondent does not claim, nor is there any evidence to support a conclusion, that we should treat a portion of the monthly subscriber fee paid by ICE's SMR customers as payment for the use of tower space, i.e., as a tower rental payment. Therefore, we consider ICE's installation of SMR antennas on a few of its towers to be a gratuitous accommodation to its SMR customers.

[10] The consistency requirement of the last sentence of sec. 1.469–4(d)(5)(i), Income Tax Regs., parallels that of sec. 6037(c)(1), which requires a shareholder of an S corporation to "treat a subchapter S item in a manner which is consistent with the treatment of such item on the corporate return." By reporting his 100% distributive share of ICE's income as ordinary income, petitioner acted in accordance with both provisions.

[11] Whether such separate activity treatment would be proper is, as stated *supra* note 1, an issue we need not address because petitioner has conceded it.

sentence of section 1.469–4(d)(5)(i), Income Tax Regs., is inapplicable to him.

Section 1.469–4(e)(1), Income Tax Regs., prohibits only the regrouping of activities by "the taxpayer" (in this case, ICE) and, therefore, constitutes a limitation on the manner in which the taxpayer (i.e., ICE) reports its income for purposes of section 469. It does not affect petitioner's reporting of ICE's rental payments to him.

### 3. *Conclusion*

We find that petitioner's tower and land rentals constituted the rental of property to ICE for use in a rental activity, which, by definition, *see* sec. 1.469–4(b)(1), Income Tax Regs., is not a trade or business activity. As a result, section 1.469–2(f)(6), Income Tax Regs., is inapplicable to petitioner's income from those rentals for the years in issue, and respondent may not treat that income as non-passive-activity income pursuant to that regulation.

We recognize that, because ICE erroneously reported all of its income as ordinary business (non-passive-activity) income, nonapplication of the self-rental rule of section 1.469–2(f)(6), Income Tax Regs., to ICE's rental payments to petitioner, in effect, results in the reduction of what was reported as "active business income" and the offsetting creation of "passive income" in seeming contravention of the congressional conferees' directive to issue regulations preventing that result. *See* H.R. Conf. Rept. No. 99–841 (Vol. II), at II–147 (1986), 1986–3 C.B. (Vol. 4) 1, 147. We do not believe, however, that ICE's tax return mischaracterization of its tower access rental income from third parties should control the application of the self-rental rule where, as here, it is, by its terms, inapplicable, i.e., where petitioner's towers were not, in fact, used in a trade or business. Moreover, we are not persuaded that the result we reach herein violates the conferees' directive as it does not, in fact, permit "passive income" to offset "active business income".

B. *Separate Treatment of Tower Rentals Producing Net Losses*

1. *Analysis*

Petitioner objects to what he refers to as the "selective" re-characterizing of the income from his profitable tower and land rentals to ICE but not the losses from the unprofitable rentals. On his returns for the years in issue, he character-ized all of his property rentals to ICE as passive activities generating either passive activity income or loss. In effect, petitioner grouped all of his property rentals to ICE and treated them as a "single activity" pursuant to section 1.469–4(c)(1), Income Tax Regs. He argues that the "losses were generated from the same type of activity as the profits * * * and if the profits from the profitable Towers and Underlying Land are active, then the net losses from the unprofitable Towers must be treated as active as well." In short, peti-tioner argues for consistency of treatment. Therefore, we assume that, because we reject respondent's treatment of petitioner's profitable tower and land rentals to ICE as gener-ating non-passive-activity income, petitioner would be willing to adhere to his return position whereby he treated all of his property rentals to ICE as passive activities generating either passive activity income or passive activity loss. Moreover, that is the treatment required by section 469(c)(2), which generally requires "any rental activity" to be treated as a passive activity. Thus, the issue regarding the proper characterization of petitioner's rentals producing net losses is now moot.

2. *Conclusion*

There is no change to petitioner's reporting of his losses from unprofitable tower and land rentals to ICE as passive activity losses.

C. *Separate Treatment of the Land-Only Rentals*

1. *Introduction*

During each of the years in issue, petitioner made three land-only rentals to ICE. Each of those leases generated net rental income to petitioner, which he reported as passive activity income on his returns for the years in issue.

Respondent argues that the rental income from those land-only rentals was properly recharacterized as non-passive-activity income pursuant to section 1.469–2T(f)(3), Temporary Income Tax Regs., *supra*, which requires such recharacterization with respect to income from a rental activity where "less than 30 percent of the unadjusted basis of the property used * * * by customers in * * * [that] activity * * * during the taxable year is subject to the allowance for depreciation under section 167".

Petitioners reject respondent's argument on two grounds: (1) respondent improperly separated ("ungrouped") the land-only rentals from petitioners' other rentals of towers and land to ICE in applying the 30% test of section 1.469–2T(f)(3), Temporary Income Tax Regs., *supra*, and (2) respondent's argument was first raised on brief and, for that reason alone, should be rejected as untimely.

2. *Analysis and Conclusions*

a. *Timeliness*

Petitioners cite the following language set forth in respondent's pretrial memorandum as demonstrating respondent's intent to apply the 30% test on an aggregate basis to all of the properties (towers and land) leased to ICE:

Alternatively, under Treas. Reg. section 1.469–2T(f)(3), the income earned by petitioner from leasing the telecommunications towers and the land upon which they sit, is non-passive income since less than 30 percent of the unadjusted basis of the property is subject to the allowance for depreciation under section 167. Simply stated, income from leased land is nonpassive. Land has an indefinite useful life and is not depreciable. Accordingly, under Treas. Reg. section 1.469–2T(f)(3), unless petitioner produces documentation that more than 30% of the unadjusted basis of the property is depreciable, then the rental activity is nonpassive.

Petitioners allege that, consistent with that language, they "presented evidence at trial that 'more than 30 percent of the unadjusted basis of [all of] the [leased] property' * * * is depreciable." They further allege: "Had the Commissioner asserted that there was a further question as to whether the rentals of the Underlying Land and the rentals of the Towers (or any of them) were separate activities, evidence on that point could have been introduced as well." Thus, petitioners claim both surprise and prejudice with respect to respond-

ent's application of the 30% test exclusively to the land-only rentals, and, in support of their argument, they cite our decision in *Seligman v. Commissioner*, 84 T.C. 191, 197–199 (1985), *aff'd*, 796 F.2d 116 (5th Cir. 1986), which involved surprise and prejudice to the taxpayer in regard to the Commissioner's initial assertion in his opening brief of "additional bases for his disallowance of specific items". Under those circumstances we declined to consider the newly raised issues.

In this case, petitioners may have been surprised by respondent's argument, but they were not prejudiced. The issue respondent raises (application of the 30% test to the land-only rentals) presents an issue of law. The fact that there were three land-only rentals in each of the years in issue is not in dispute. Therefore, we fail to see what additional evidence petitioners were prevented from introducing in refutation of respondent's argument (i.e., it is beyond dispute that 100% of each of those rentals consisted of nondepreciable land). Moreover, any surprise to petitioners was mitigated by their ability to address the merits of respondent's argument in their reply brief, which, in fact, they did. The element of surprise was further mitigated by the above-quoted portion of respondent's pretrial memorandum, which, although ambiguous regarding respondent's intent to separately apply the 30% test to the land-only rentals, at least suggests that possibility by observing that "income from leased land is nonpassive." Under those circumstances, we find *Seligman* distinguishable and, therefore, not controlling. Rather, we are guided in this matter by our analysis in *Ware v. Commissioner*, 92 T.C. 1267, 1268 (1989), *aff'd*, 906 F.2d 62 (2d Cir. 1990), wherein we stated:

  The rule that a party may not raise a new issue on brief is not absolute. Rather, it is founded upon the exercise of judicial discretion in determining whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent evidence. * * *

As discussed above, we do not believe that the circumstances herein warrant our rejection of respondent's argument on the ground that it was not timely raised. Moreover, it is always open to this Court to apply the correct law to the facts before it. *See, e.g.*, *Concord Consumers Hous. Coop. v. Commis-*

*sioner*, 89 T.C. 105, 126 (1987) (Körner, J. concurring) ("Neither party can avoid the application of the correct law to the facts of the case by failing to plead or argue it. That is the province of the Court.").

We shall consider the issue of whether it is proper to separately apply the 30% test to petitioners' land-only rentals.

b. *Application of Section 1.469–2T(f)(3), Temporary Income Tax Regs., to Petitioners' Land-Only Rentals*

Petitioners argue that, because all of the property rentals to ICE "involved the same landlord (or grantor trusts owned by the same landlord), the same tenant, and the same general types of property used for the same purpose", there is no basis for applying the 30% test separately to the land-only rentals. Thus, petitioners make the same argument with respect to the application of the 30% test that they did with respect to the application of the self-rental rule: Both should be applied to the aggregate of the properties he leased to ICE on the ground that all of those rentals constituted a "single activity" pursuant to section 1.469–4(c), Income Tax Regs. We disagree.

Respondent's separate application of the 30% test to petitioners' land-only rentals to ICE is supported by section 1.469–4(d)(2), Income Tax Regs., which provides as follows:

(2) Grouping real property rentals and personal property rentals prohibited.—An activity involving the rental of real property and an activity involving the rental of personal property (other than personal property provided in connection with the real property or real property provided in connection with the personal property) may not be treated as a single activity.

The section 469 regulations do not furnish illustrative examples of the foregoing provision's parenthetical exception. Nonetheless, we find no basis for concluding that it applies to petitioners' land-only rentals. The land is not "provided in connection with" any personal property situated thereon, and it is not "provided in connection with" the towers situated on other parcels of land where petitioner provides both a tower and land, one "in connection with" the other.

Therefore, we find that respondent correctly applied the 30% test of section 1.469–2T(f)(3), Temporary Income Tax Regs., *supra*, to the land-only rentals to ICE, and that, pursu-

ant to that provision, petitioners' income from those leases constituted non-passive-activity income.

*Decision will be entered under Rule 155.*