Maimonides Medical Center v. United States

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: October 6, 2015     Decided: December 18, 2015)

Docket No. 14-4279-cv

MAIMONIDES MEDICAL CENTER,

*Plaintiff-Appellant,*

— v. —

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

B e f o r e:

LYNCH, LOHIER, and CARNEY, *Circuit Judges*.

Plaintiff-Appellant Maimonides Medical Center ("MMC") appeals from a decision of the United States District Court for the Eastern District of New York (Eric N. Vitaliano, *Judge*) granting summary judgment to the government. The parties agree that MMC is entitled to a refund for an overpayment of taxes, but

disagree as to the interest rate to be applied under I.R.C. § 6621(a)(1). MMC argues that the lower interest rates applicable to "corporation[s]" apply only to for-profit corporations, and that because it is a nonprofit corporation, it is entitled to the higher standard rate. We disagree, and hold that the lower corporate interest rates provided by § 6621(a)(1) are also applicable to nonprofit corporations.

AFFIRMED.

---

THOMAS D. SYKES, Gould & Ratner LLP, Chicago, Illinois, *for Plaintiff-Appellant*.

ARTHUR T. CATTERALL (Richard Farber and Deborah K. Snyder, *on the brief*), Attorneys, Tax Division, Department of Justice, *for* Caroline D. Ciraolo, Acting Assistant Attorney General (Kelly T. Currie, United States Attorney, *of counsel*), Washington, District of Columbia, *for Defendant-Appellee*.

---

GERARD E. LYNCH, *Circuit Judge*:

When an ordinary taxpayer receives a refund for an overpayment of taxes, interest is applied to the overpayment amount at a rate equaling the Federal short-term rate ("FSTR") plus three percentage points. I.R.C. § 6621(a)(1)(B). If the taxpayer is a corporation, however, it is entitled only to a lower interest rate: the FSTR plus two percentage points on the first $10,000 for each taxable period,

2

and the FSTR plus half a percentage point on the remainder.  I.R.C. § 6621(a)(1).

Plaintiff-Appellant Maimonides Medical Center ("MMC") and the government

agree that MMC is entitled to an overpayment refund and further agree on the

amount of that overpayment, but disagree on the interest rate to be applied.

MMC argues that, despite being organized as a corporation under New York law,

it should receive the benefit of the higher interest rate applicable to non-

corporations, because it is a nonprofit corporation and the word "corporation" in

§ 6621(a)(1) should be construed to refer only to for-profit corporations.  We

disagree, and hold that § 6621(a)(1)'s lower interest rate applies equally to for-

profit corporations and nonprofit corporations such as MMC.  Accordingly, we

AFFIRM the judgment of the district court.

## BACKGROUND

MMC, a teaching hospital located in Brooklyn, is organized as a domestic

not-for-profit corporation under New York law.  Pursuant to § 501(a) of the

Internal Revenue Code, it is exempt from federal income tax as a "[c]orporation[]

. . . organized and operated exclusively for religious, charitable, scientific, testing

for public safety, literary, or educational purposes."  I.R.C. § 501(c)(3).  It is not

exempt, however, from paying taxes under the Federal Insurance Contributions

3

Act ("FICA"), I.R.C. §§ 3101 *et seq.*, which requires employers and employees to pay a tax on "wages" from "employment," I.R.C. § 3111(a), (b), the proceeds of which fund Social Security and Medicare.

Services "performed by a student who is enrolled and regularly attending classes at [a] school, college, or university" are excluded from FICA's definition of "employment." I.R.C. § 3121(b)(10). For several years, teaching hospitals and the Internal Revenue Service ("IRS") clashed over whether services performed by medical residents fell under that exclusion. Eventually, the IRS promulgated a regulation providing that, effective April 1, 2005, "employee[s] whose normal work schedule is 40 hours or more per week" – a category that includes medical residents – are not within the student exclusion. Treas. Reg. § 31.3121(b)(10)-2(d)(3)(iii). MMC, which had been paying FICA taxes on its residents' wages since at least 1999, then brought this action in the Eastern District of New York, seeking a refund of the FICA taxes that it had paid *before* the effective date of the regulation. In 2010, the IRS agreed that FICA taxes paid on residents' wages for tax periods before April 1, 2005 were refundable, see IRS News Release IR-2010-25 (Mar. 2, 2010), and the parties agreed to discontinue this action.

4

On October 1, 2013, however, the case was reopened. The remaining point of contention between the parties is the interest rate to be applied to MMC's refund. The government seeks to apply the lower interest rate which § 6621(a)(1) provides for overpayments by "corporations," whereas MMC argues that that interest rate does not apply to nonprofit organizations that happen to be organized as corporations under state law, and thus that it is entitled to the higher standard interest rate. The parties cross-moved for summary judgment, and the district court (Vitaliano, *J.*) granted the government's motion and denied MMC's. MMC timely appealed.

## DISCUSSION

The parties' disagreement centers on the meaning of the word "corporation" in § 6621(a)(1), which specifies the interest rate to be applied to refunds for overpayments. As noted above, MMC concedes that it is a "corporation" both under New York law and for the purpose of obtaining an exemption from federal income tax under § 501(a) & (c)(3). It contends, however, that, as used in § 6621(a)(1), the word "corporation" does not include nonprofit corporations. For the following reasons, we disagree.

5

I.     Ordinary Meaning of "Corporation"

We begin with the fact that the word "corporation," standing alone, ordinarily refers to both for-profit and nonprofit entities without distinction.  The dictionary definition of "corporation" is not restricted to entities that carry on activities for profit.  See Webster's Third New International Dictionary 510 (1993) (defining "corporation" as "an entity recognized by law as constituted by one or more persons and as having various rights and duties together with the capacity of succession,"); Oxford English Dictionary (2d ed. online version 2015) (defining "corporation" as "an artificial person created by royal charter, prescription, or act of the legislature, and having authority to preserve certain rights in perpetual succession").  The famous definition given by Chief Justice Marshall in Trustees of Dartmouth College v. Woodward is to the same effect: "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law.  Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence."  17 U.S. (4 Wheat.) 518, 636 (1819).  A profit-seeking motive does not appear on the list of distinguishing characteristics of a corporation given in one leading treatise.  See 1 William Meade Fletcher, Cyclopedia of the Law of

6

Corporations § 5 (listing those characteristics as follows: a corporation "is an artificial person, a legal entity, capable of acting through its corporate officers and agents, of suing and being sued, of taking and holding property, of contracting in its own name, and of continuing to exist independently of the individuals who compose it"(footnotes omitted)).[1]

MMC argues for a different starting point. It contends that, "in ordinary, everyday usage," the word "corporation" refers only to for-profit entities, as in the assertion that "corporations are a force for good in the world." That argument is unpersuasive. While it is true that, in the context of a bar- or dorm-room political discussion, "corporation" may refer exclusively to profit-seeking business entities, that is not, as we have seen, the "ordinary, everyday" definition supplied in the dictionary. Further, in the colloquial sense advocated by MMC, "corporation" typically refers to any profit-seeking legal entity, regardless of form, and includes entities like partnerships, which are *not* treated as corporations by the Internal Revenue Code. See I.R.C. § 7701(a)(2) (defining "partnership" as an "unincorporated organization . . . which is not, within the

---

[1] Black's Law Dictionary states that a corporation is "usu[ally] a business." Corporation, Black's Law Dictionary (10th ed. 2014). But that statement too necessarily implies that the word sometimes refers to entities that are not businesses.

meaning of this title, a . . . corporation"). While such loose use of the word "corporation" may be appropriate in the context of a casual debate about the role of the profit motive in contemporary society, it cannot be the meaning that controls in the Internal Revenue Code.

II.     Definitional Provision

Next, we turn to § 7701(a) of the Internal Revenue Code, which provides definitions for certain words that apply throughout the Code, "where not otherwise distinctly expressed or manifestly incompatible with the intent thereof." The provision relating to the word "corporation" has not changed since 1918. It reads: "The term 'corporation' includes associations, joint-stock companies, and insurance companies." I.R.C. § 7701(a)(3).

As we have recognized, that language is not technically a definition: it does not "specif[y] the characteristics of the entity that it 'defines.'" McNamee v. Dep't of Treasury, 488 F.3d 100, 106 (2d Cir. 2007) (alteration omitted). It does, however, serve to *expand* the federal tax law meaning of "corporation" beyond entities that would ordinarily fall under that term; it offers no hint that Congress intended to *contract* the ordinary meaning of the term in any way. The statutory definition thus strongly suggests that, at a minimum, all entities covered by the

8

core definition of "corporation" are also included. Section 7701(a)(3) does not provide that core definition itself, but because the ordinary meaning of "corporation" includes nonprofit entities that take the corporate form, the same should be true of the core term as used in § 7701(a)(3). That core definition most plausibly encompasses any entity upon which state law has conferred the rights and duties characteristic of a "corporation" as defined in the sources quoted above. Judicial opinions have generally adopted that reading of § 7701(a)(3). See O'Neill v. United States, 410 F.2d 888, 899 (6th Cir. 1969) (holding "that a corporation created under state law is a corporation within the meaning of . . . § 7701(a)(3)"); United States v. Empey, 406 F.2d 157, 169 (10th Cir. 1969) (noting "the long followed administrative practice of treating a corporation organized and chartered under state law as a corporation for federal income tax purposes," which Congress "tacitly approved" by repeatedly reenacting § 7701(a)'s definition of "corporation").[2]

---

[2] Because of the open-ended nature of § 7701(a)(3)'s definition of "corporation," the IRS has promulgated regulations, known as "check-the-box regulations," "to provide straightforward guidance as to how various types of entities, including single-owner businesses, are to be classified for tax purposes." McNamee, 488 F.3d at 107. Much of the district court's opinion is devoted to showing that MMC is a "corporation" under those regulations, and much of MMC's briefing on appeal is devoted to arguing that the regulations are invalid. Because MMC is unambiguously a "corporation" under the statutory definition, however, we need not address those arguments.

Several other Code provisions use the word "corporation" in a manner that plainly includes incorporated nonprofit organizations, bolstering our conclusion that the Code's generally applicable definition of "corporation" under § 7701(a)(3) is not limited to for-profit entities. For example, under § 501(a) & (c)(3), "[c]orporations . . . organized and operated exclusively for . . . charitable . . . purposes" are exempt from federal income tax. If the word "corporation" referred only to for-profit entities, that provision would be self-contradictory. Similarly, § 1381(a)(2)(A) specifies that the rules governing the tax treatment of "cooperatives" apply to, *inter alia*, "any corporation operating on a cooperative basis other than an organization . . . which is exempt from tax under this chapter." The carve-out for tax-exempt organizations would not have been necessary if they were already excluded from the definition of "corporation." The same is true of the carve-out in § 1504(b)(1), which deals with affiliated groups of corporations, and defines "includible corporation" to include "any corporation except," *inter alia*, "[c]orporations exempt from taxation under section 501." Because "we must give effect to every word of a statute wherever possible," Leocal v. Ashcroft, 543 U.S. 1, 12 (2004), we cannot easily write off these last two provisions as instances of overcautious drafting, as MMC urges.

10

III.    Textual Analysis of § 6621

As noted above, § 7701(a)(3)'s definition of "corporation" applies throughout the Code, "where not otherwise distinctly expressed or manifestly incompatible with the intent thereof."  Having concluded that that definition includes nonprofit corporations such as MMC, we must next determine whether § 6621 "distinctly expresse[s]" a different definition, or whether applying § 7701(a)(3)'s definition in the context of § 6621(a)(1) is "manifestly incompatible with the intent" of the Code.  In that respect, MMC's argument focuses on the relationship between § 6621(a)(1), the overpayment provision, and § 6621(a)(2) & (c), which set the interest rate to be applied to *underpayments* of taxes.  The relevant provisions are set out below:

> (a) General rule. –
>> (1) Overpayment rate. – The overpayment rate established under this section shall be the sum of –
>> (A) the Federal short-term rate . . . plus
>> (B) 3 percentage points (2 percentage points in the case of a corporation).
>> To the extent that an overpayment of tax by a corporation for any taxable period (as defined in subsection (c)(3), applied by substituting "overpayment" for "underpayment") exceeds $10,000, subparagraph (B) shall be applied by substituting "0.5 percentage point" for "2 percentage points".

(2) Underpayment rate. – The underpayment rate established under this section shall be the sum of –

(A) the Federal short-term rate . . . plus

(B) 3 percentage points.

. . . .

(c) Increase in underpayment rate for large corporate underpayments. –

(1) In general. – For purposes of determining the amount of interest payable under section 6601 on any large corporate underpayment for periods after the applicable date, paragraph (2) of subsection (a) shall be applied by substituting "5 percentage points" for "3 percentage points".

. . . .

(3) Large corporate underpayment. – For purposes of this subsection –

(A) In general. – The term "large corporate underpayment" means any underpayment of a tax by a C corporation for any taxable period if the amount of such underpayment for such period exceeds $100,000.

(B) Taxable period. – For purposes of subparagraph (A), the term "taxable period" means –

(i) in the case of any tax imposed by subtitle A, the taxable year, or

(ii) in the case of any other tax, the period to which the underpayment relates.

Like the overpayment provisions, the underpayment provisions apply a less favorable interest rate to tax payment errors by corporations above a certain

dollar amount. In the underpayment context, however, the less favorable interest rate explicitly applies only to C corporations, because, under subsection (c)(1), it applies to "any large corporate underpayment," which subsection (c)(3) defines as an underpayment by a C corporation in excess of $100,000. MMC contends that the limitation to C corporations also applies in the overpayment context, and that, since it is not a C corporation,[3] it should receive the more favorable standard interest rate on its overpayment refund. The textual basis for MMC's claim is the cross-reference to subsection (c)(3) in the "flush language" of subsection (a)(1) (that is, the sentence beginning with "To the extent"), which has the effect of reducing the interest rate on overpayments by corporations above $10,000 from the FTSR plus two percentage points to the FTSR plus half a percentage point. The flush language refers to "an overpayment of tax by a corporation for any taxable period (as defined in subsection (c)(3), applied by substituting

---

[3] The term "C corporation" refers to corporations that are taxed under subchapter C of the income tax provisions of the Internal Revenue Code. Cf. Sidell v. Comm'r, 225 F.3d 103, 105 (1st Cir. 2000) (equating a "so-called C corporation" with "a regular business corporation"). Section 1361(a)(2) of the Code, however, provides that "the term 'C corporation' means . . . a corporation which is not an S corporation." Relying on that provision, the government argues that, because MMC is not an S corporation, it must in fact be a C corporation, and should receive the lower corporate interest rate regardless of the construction given to § 6621(a)(1). Because we disagree with MMC's position that the lower interest rate applies only to C corporations, we do not reach that argument.

'overpayment' for 'underpayment')."  According to MMC, the words "as defined in subsection (c)(3)" have the effect of adding the qualifier "C" to every instance of the word "corporation" in the overpayment provisions.

Unfortunately for MMC, that argument does not withstand close scrutiny. The phrase "as defined in subsection (c)(3)" presupposes a term to be defined. That term, reading the sentence most naturally, is the term immediately preceding the "as defined" parenthetical – namely, "taxable period."  As it turns out, "taxable period" *is* defined in subsection (c)(3), and the only other term explicitly defined in that subsection – "large corporate underpayment" – does not appear anywhere in subsection (a)(1).  Further, using "taxable period" as the term to be defined gives meaning to the rest of the "as defined" parenthetical, because subsection (c)(3)'s definition of "taxable period" includes the word "underpayment," for which the word "overpayment" can be substituted (as the parenthetical directs) without doing any damage to the coherence of the statute.

MMC argues that this reading of § 6621(a)(1) is untenable, because the parenthetical refers to subsection (c)(3), rather than to subsection (c)(3)(B), which is more specifically where the definition of "taxable period" is located.  It emphasizes that the reference to subsection (c)(3) survived a 1997 technical

14

amendment to the "as defined" parenthetical itself.[4]  According to MMC, this

shows that Congress intended to refer to the entirety of subsection (c)(3), rather

than to subsection (c)(3)(B) in particular.  That argument is unavailing.  The

imprecision MMC complains of pervades the Internal Revenue Code.  See, e.g.,

I.R.C. § 42(k)(2)(A) (referring to "a qualified nonprofit organization (as defined in

subsection (h)(5))," even though "qualified nonprofit organization" is in fact

defined in subsection (h)(5)(C)); I.R.C. § 146(f)(6)(A) (referring to "a qualified

housing issue (as defined in subsection (d)(5))," even though "qualified housing

issue" is defined in subsection (d)(5)(B)(ii)).  Further, because the "as defined"

parenthetical unambiguously modifies only the term "taxable period," for the

reasons we explain below, there was no need for Congress in 1997 to add a

specific reference to subsection (c)(3)(B).

MMC's proposed readings of § 6621(a)(1) wreak havoc on the statutory

language.  First, the "as defined" parenthetical could conceivably be read as

modifying the entire phrase that precedes it: "an overpayment of tax by a

corporation for any taxable period."  Because subsection (c)(3) defines "large

---

[4] The 1997 technical amendment added the words "applied by substituting 'overpayment' for 'underpayment'" to the parenthetical.  Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1604(b)(1), 111 Stat. 788, 1097 (1997).

corporate underpayment," this reading has some superficial plausibility. Upon

closer inspection, however, it renders the statute incoherent. If "an overpayment

of tax by a corporation for any taxable period" means the same thing as a "large

corporate underpayment" (substituting "overpayment" for "underpayment"),

then, under subsection (c)(3)(A), it must exceed $100,000. But subsection (a)(1)'s

flush language only applies "[t]o the extent that [the] overpayment . . . exceeds

$10,000." Thus, if the parenthetical imported subsection (c)(3)'s definition of

"large corporate underpayment," the flush language would in effect have to be

read as applying only "to the extent that an overpayment exceeding $100,000

exceeds $10,000" – a nonsensical result which cannot be what Congress intended.

In its reply brief, MMC concedes as much, and suggests that the

parenthetical more narrowly modifies only the phrase "by a corporation for any

taxable period." Elsewhere, MMC states that the word "corporation" is the term

in the flush language to be defined. We understand MMC to be arguing that the

parenthetical modifies two terms: "corporation" *and* "taxable period." See Reply

Br. 16 (recognizing that the flush language makes "a cross reference to the

definition of 'taxable period'").

That reading, however, fares no better than the previous one. First, the parenthetical is most naturally read as modifying only the term that immediately precedes it, rather than that term *and* an additional term found a few words earlier in the same sentence. There is no reason why the parenthetical should modify "taxable period" and "corporation," but not other terms in the flush language, such as "overpayment." MMC's response – that "overpayment"does not need defining, because a standard definition for that term already exists – begs the question: "corporation" is already defined in § 7701(a)(3), and it is unclear why it would be in any greater need of further definition than "overpayment."

Second, and more importantly, while subsection (c)(3) does define "taxable period," as discussed above, it does *not* provide a definition of "corporation," let alone a definition restricting the meaning of that word to C corporations. If the parenthetical modifies "corporation," the reader following the cross-reference to subsection (c)(3) thus comes up empty-handed. We are not persuaded by MMC's argument that subsection (c)(3)'s definition of "large corporate underpayment" as including only underpayments by C corporations amounts to an implicit redefinition of the word "corporation" to mean "C corporation." Subsection

17

(c)(3) provides a definition for a particular phrase – "large corporate underpayment" – which the statute uses as a technical term of art.  The fact that the statute gives this phrase a specific, narrow meaning does not imply that the meanings of the constituent words of the phrase are correspondingly narrowed when they are used independently.

A third problem with MMC's theory is that the word "corporation" appears once in the statute *before* the flush language, in subsection (a)(1)(B), which sets the default interest rate on overpayments by corporations at the FSTR plus two percentage points.  If MMC is to receive the standard interest rate for non-corporations – the FSTR plus three percentage points – then "corporation," as it appears in subsection (a)(1)(B), must also be read to mean "C corporation." If the "as defined" parenthetical is what effects this redefinition, one would expect it to be located in subsection (a)(1)(B), immediately after the word "corporation," rather than several words after the later appearance of the word "corporation" in the flush language.  MMC's response is that the language that sets the interest rate for corporations was added to subsection (a)(1)(B) in 1998, several years later than the flush language and its "as defined" parenthetical. MMC argues that, because the parenthetical already defined "corporation" to

18

mean "C corporation," it would have been "overkill" to include definitional language in the 1998 amendment. Appellant's Br. 24. That may be, but MMC does not explain why Congress, in 1998, could not simply have moved the parenthetical to subsection (a)(1)(B). The awkward result is that the word "corporation" appears in the provision twice before the parenthetical purportedly defines it.

MMC's invocation of the *in pari materia* canon of statutory construction is similarly unavailing. Under that canon, "language used in one portion of a statute . . . should be deemed to have the same meaning as the same language used elsewhere in the statute." Mertens v. Hewitt Assocs., 508 U.S. 248, 260 (1993). MMC complains that the government's reading of § 6621 fails to give the words "corporation" and "corporate" a consistent meaning throughout that section. But it is mistaken: the word "corporation," *standing alone*, has only one meaning throughout § 6621 – namely, the meaning derived from § 7701(a)(3). It has the meaning "C corporation" only where it is preceded by the qualifier "C." By asking us to read "C" into subsection (a)(1), MMC seeks to have the rule of *in pari materia* (insofar as it applies at all) override another canon of interpretation, namely, the rule that "[w]here Congress includes particular language in one

19

section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983). As to the word "corporate," it refers specifically to C corporations only because, as we have explained, it is used as part of the term of art "large corporate underpayment," which the statute explicitly restricts to underpayments by C corporations.

Ultimately, MMC's position founders because there was another, much simpler way for Congress to achieve the result MMC seeks here: it could simply have added the qualifier "C" to the word "corporation" wherever it appears in subsection (a)(1). MMC asks us to read the "as defined" parenthetical as doing the work of that qualifier, but that would require us to disregard the placement of that parenthetical several words *after* the word "corporation" in the flush language, the fact that "corporation" is not actually defined in subsection (c)(3), and the earlier appearance of the word "corporation" in subsection (a)(1)(B). Reading the parenthetical to apply only to the term "taxable period" is thus the only plausible way to interpret the statute.

IV.    Policy Arguments

MMC's final set of arguments relates to what it perceives as the "wholly perverse," "irrational" and "plainly unacceptable" substantive effects of the government's reading of § 6621(a)(1).  Appellant's Br. 37.  We do not believe that the effects identified by MMC are so clearly contrary to Congressional intent.  First, MMC complains that the government's reading discriminates irrationally between the "siblings" in the nonprofit "nest," id., that is, between tax-exempt entities that happen to be organized as corporations under state law and those that have chosen not to adopt the corporate form.  But § 6621(a)(1) discriminates between for-profit entities along the same lines.  It is well within the power of Congress to make distinctions based on whether or not a taxable entity qualifies as a "corporation" under § 7701(a)(3), and Congress has unambiguously done so here, regardless of whatever incongruity MMC may perceive in that decision.

Next, MMC finds it objectionable that, under the government's interpretation of § 6621(a)(1), nonprofit corporations (which, as tax-exempt organizations, are highly favored under the Internal Revenue Code) are treated identically to C corporations (which are subject to double taxation and, MMC asserts, are thus the Code's least favored entities).  MMC, however, pays FICA

21

taxes just as for-profit corporations do, and its exemption from income tax as a

§ 501(c)(3) organization does not obviously entitle it to additional favorable

treatment throughout the Code, particularly in connection with taxes from which

it is not exempt.

Finally, MMC points out that the government's reading of § 6621(a)(1)

creates an asymmetry between nonprofit corporations' overpayment and

underpayment interest rates: such corporations receive the least favorable

interest rate on their overpayment refunds, under subsection (a)(1)'s flush

language, but are not similarly "punished" when they underpay their taxes,

because the high interest rate for "large corporate underpayments" applies only

to C corporations.  But § 6621 plainly does not reflect a policy of perfect

symmetry between overpayment and underpayment interest rates.  For instance,

overpayment rates are generally lower than underpayment rates; corporations

and non-corporations receive different interest rates no matter the dollar amount

of the overpayment under subsection (a)(1)(B), whereas they pay the same rate

on relatively small underpayments; and the threshold amount for the flush

language's less favorable corporate interest rate on overpayments is $10,000,

whereas the corresponding threshold for "large corporate underpayments" is

22

$100,000.  While the government has offered no policy justification for the asymmetry MMC complains of, that asymmetry stands in no more need of explanation, and is no more lacking an obvious rationale, than the other asymmetries created by § 6621.

## CONCLUSION

The district court correctly rejected MMC's interpretation of § 6621(a)(1). Accordingly, its judgment is affirmed.